**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CIS COMMUNICATIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 4:21-cv-00359-JAR |
| | ) | |
| REPUBLIC SERVICES, INC., and ALLIED SERVICES, LLC, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendants Republic Services, Inc. ("Republic") and Allied Services, LLC's ("Allied") Motion to Dismiss. (Doc. No. 15). Plaintiff CIS Communications, LLC ("CIS") brings a number of claims related to Defendants' billing practices. For the reasons set forth below, the motion will be denied.

## I. Background[1]

CIS entered into a contract (the "Service Agreement") with Midwest Waste, Inc. ("Midwest Waste") for waste-removal services in May of 2005. Midwest Waste merged into Allied, a subsidiary of Republic, in March of 1998. CIS's monthly Service Charge when it began receiving services in June of 2005 was $44 per month. That charge increased to $328.19 by 2018. (Compl. at ¶ 67).

[1] The facts are taken from CIS's Complaint ("Compl."), Doc. No. 1, which the Court accepts as true for purposes of Defendants' motion to dismiss.

Pursuant to the Service Agreement, Defendants are authorized to increase service charges for either Mandatory Reasons without customer consent or Optional Reasons with customer consent. The Service Agreement provides the following on mandatory increases:

> Customer agrees that Midwest Waste may increase the rates hereunder proportionately to adjust for any increase in [fuel] costs or any increases in transportation costs due to changes in location of the disposal facility. Customer agrees that Midwest Waste may also increase the rates from time to time to adjust for increase in the Consumer Price Index, and Customer agrees that Midwest Waste may also proportionately pass through to Customer increases in the average weight per container yard of the Customer's Waste Materials, increase in Midwest Waste's costs due to changes in local, state or federal rules, ordinances or regulations applicable to Midwest Waste's operations or the services provided hereunder, and increases in taxes, fees or other governmental charges assessed against or passed through to Midwest Waste (other than income or real property taxes).

*Id*. at ¶ 31.

Any other rate increase is for an Optional Reason: Defendants "may only increase rates for reasons other than those set forth above with the consent of the Customer. Such consent may be evidenced verbally, in writing, or by the actions and practices of the parties." *Id.*

Republic manages billing for its subsidiaries, including Allied. CIS was billed by Republic and made payments to Republic. The Service Agreement provides the following on payment:

> Customer agrees to pay Midwest Waste on a monthly basis for the services and/or equipment furnished by Midwest Waste in accordance with the charges and rates provided for herein. Payment shall be made by Customer to Midwest Waste within ten (10) days of an invoice from Midwest Waste. Midwest Waste may impose and customer agree to pay a late fee for all past due payment….

*Id*. at ¶ 43.

The invoices CIS received from Republic identify the "Total Amount Due" each month. The Total Amount Due consists of "Service Charges" as well as any past due charges from prior months. *Id*. at ¶¶ 46-47. Any increases in the Service Charges are listed under "Authorized

Service Charge Increases." *Id*. at ¶ 49. The invoices never identify any increases as "optional" or in any other way indicate that an increase may require customer consent. *Id*. at ¶¶ 50-57. Furthermore, when a customer fails to pay a bill on time, Defendants charge a late fee. The late fee is calculated as a percentage of the "Total Amount Due," including any optional increases. Thus, Defendants treat Optional Reason increases as though they are part of the total amount owed by the customer before the customer has taken any action on the increase—such as paying the increased cost.

Between 2015 and the end of 2017, Defendants increased CIS's Service Charges by between 15.6% and 29.9% annually. CIS believed at the time it paid the bills that these increases were for Mandatory Reasons and as such it was obligated to pay them under the Service Agreement. These increases were labeled in the invoices as "Authorized Service Charge Increases." *Id*. at ¶ 49. In July of 2018, CIS contacted Defendants to inquire about the rising cost of service. Defendants then offered to reduce CIS's monthly bill from $328.19 to $55.00, a reduction of $273.19. *Id*. at ¶ 72. CIS alleges this is evidence that Defendants had a practice of increasing the Service Charges for Optional Reasons without informing customers the increase is not mandatory because Defendants would be unlikely to offer a reduction if the increase was due to one of the six Mandatory Reasons. CIS claims it would not have paid the increases if it was aware they were not mandatory. CIS then terminated the Service Agreement.

Defendants' billing practices have been the subject of two other lawsuits relevant to their motion to dismiss. In March of 2019, CIS filed a lawsuit alleging similar claims against Defendants: *CIS Commc'ns, LLC v. Republic Servs., Inc*., No. 4:19-cv-389-JAR ("*CIS I*"). Pietoso, Inc. filed a separate complaint in this Court against Defendants the same day. *Pietoso, Inc. v. Republic Servs., Inc*., No. 4:19-cv-397-JAR. ("*Pietoso*"). The Court granted the

Defendants' motion to dismiss in *Pietoso*, finding there was no breach because Pietoso had paid the increased rate with full knowledge of the increased amount, and as such consented to the charges. *Pietoso, Inc. v. Republic Servs., Inc.*, No. 4:19-CV-397 RLW, 2020 WL 224516, at *1 (E.D. Mo. Jan. 15, 2020), reconsideration denied, No. 4:19-CV-397 RLW, 2020 WL 4898159 (E.D. Mo. Aug. 20, 2020). ("*Pietoso* Dismissal"). In *CIS I*, the Court found the reasoning in the *Pietoso* Dismissal to be sound and dismissed CIS's complaint without prejudice. *CIS Commc'ns, LLC v. Republic Servs., Inc.*, No. 4:19-CV-00389 JAR, 2020 WL 1332076 (E.D. Mo. Mar. 23, 2020). Pietoso appealed the dismissal of its claims, and the Eighth Circuit reversed and remanded the case, finding the Court erred in concluding that Defendants had not breached the Service Agreement as a matter of law. *Pietoso, Inc. v. Republic Servs., Inc.*, 4 F.4th 620 (8th Cir. 2021) ("*Pietoso* Remand").

CIS filed its complaint in this case on March 22, 2021, raising the same claim for Breach of Contract (Count I) it brought in *CIS I*, as well as two new claims: Breach of the Covenant of Good Faith and Fair Dealing (Count II) and Fraud in the Inducement (Count III). Defendants moved to dismiss this case for a number of reasons, including those set out in *CIS I* and the *Pietoso* Dismissal. After Defendants filed their Motion to Dismiss, the Eighth Circuit remanded *Pietoso*. 4 F.4th 620. Defendants withdrew that argument in light of that decision.

Defendants remaining arguments are: 1) Count I should be dismissed in part because some damages were incurred outside the statute of limitations, 2) Count II should be dismissed because the covenant of good faith and fair dealing cannot alter the express terms of the Service Agreement, 3) Count III should be dismissed pursuant to the economic loss doctrine and because CIS has failed to adequately allege a fraud claim, and 4) Counts I and II against Republic should be dismissed because it is not a party to the Service Agreement. CIS opposes the motion.

## II. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (alteration in original) (citations omitted). "When ruling on a motion to dismiss [under Rule 12(b)(6)], the district court must accept the allegations contained in the complaint as true and all reasonable inferences from the complaint must be drawn in favor of the nonmoving party." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001).

## III. Discussion

### A. Statute of Limitations

Defendants argue Count I should be dismissed to the extent it seeks to recover damages incurred prior to March of 2016 because those damages were incurred outside the statute of limitations. CIS responds that the application of a statute of limitations is an affirmative defense and is not properly raised in a motion to dismiss.

Bar by a statute of limitations is an affirmative defense. *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130 (2008); Fed. R. Civ. P. 8(c). A defendant does not render a complaint defective by pleading an affirmative defense, *Gomez v. Toledo*, 446 U.S. 635, 640

(1980), and therefore the possible existence of a statute of limitations defense is not ordinarily a ground for Rule 12(b)(6) dismissal unless the complaint itself establishes it. *See Varner v. Peterson Farms*, 371 F.3d 1011, 1017-18 (8th Cir. 2004) (dismissal proper because complaint ruled out tolling of statute of limitations).

The complaint does not establish the application of the statute of limitations. CIS's claim for breach of contract is subject to a five-year statute of limitations. MO. REV. STAT. § 516.120. Defendants argue the statute of limitations began to run on each contested payment when it was paid and therefore CIS cannot recover damages for payments made more than five years prior to the filing of this lawsuit. However, the statute of limitations does not begin to run "when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment…." MO. REV. STAT. § 516.100. "This test is an objective one, providing that an injury is capable of ascertainment when the evidence was such to place a reasonably prudent person on notice of a potentially actionable injury." *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 764–65 (8th Cir. 2020) (quoting *Powel v. Chaminade Coll. Preparatory, Inc.*, 197 S.W.3d 576, 582 (Mo. 2006) (en banc)), *cert. denied*, No. 20-1008, 2021 WL 1521013 (U.S. Apr. 19, 2021).

CIS claims it began to suspect the majority of the Service Charge increases were due to Optional Reasons in July of 2018, when Defendants offered to reduce the Service Charge from $328.19 to $55.00. (Compl. at ¶¶ 71-75). Accepting this allegation as true and drawing all reasonable inferences from it, the injury was not capable of ascertainment until July of 2018. CIS filed this lawsuit in March of 2021, as such, the complaint does not establish the statute of limitations defense.

**B. Count II: Breach of the Covenant of Good Faith and Fair Dealing**

Defendants next argue that Count II, breach of the covenant of good faith and fair dealing, must be dismissed because the Service Agreement expressly governs questions of CIS's consent and the implied covenant of good faith and fair dealing cannot give rise to obligations not otherwise contained in the plain language of a contract. CIS responds that the contract expressly provides that rates may only be increased for optional reasons "with the consent of the Customer," and Defendants formatted their invoices to undermine its contractual right to consent to the increases. *Id*. at ¶ 31.

The good faith requirement imposed by law on every contract extends "to the manner in which a party employs discretion conferred by a contract." *BJC Health Sys. v. Columbia Cas. Co.,* 478 F.3d 908, 914 (8th Cir. 2007) (applying Missouri law). "To establish a breach of the covenant of good faith and fair dealing, the plaintiff has the burden to establish that the defendant 'exercised a judgment conferred by the express terms of the agreement in such a manner as to evade the spirit of the transaction or so as to deny [the plaintiff] the expected benefit of the contract.'" *Trone Health Servs., Inc. v. Express Scripts Holding Co.*, 974 F.3d 845, 853–54 (8th Cir. 2020) (quoting *Kmak v. Am. Century Cos., Inc.*, 754 F.3d 513, 516 (8th Cir. 2014)).

Although the covenant cannot give rise to new obligations not otherwise contained in a contract's express terms, *see Glass v. Mancuso,* 444 S.W.2d 467, 478 (Mo. 1969), to show a breach, CIS need not show it is contractually entitled to expressly consent to Optional Increases. *See Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 467 (8th Cir. 2002). "Rather, [Plaintiff] merely needed to present evidence tending to demonstrate that [Defendant] exercised its discretion so as to evade the spirit of the transaction or so as to deny the other party the

expected benefit of the contract." *Id*. (quoting *Amecks, Inc. v. Southwestern Bell Tel. Co.,* 937 S.W.2d 240, 243 (Mo. Ct. App. 1996)).

The Eighth Circuit's decision in *Stone Motor Co.* is instructive. 293 F.3d at 467. Stone Motor Company, a franchisee of General Motors, sued its franchisor for failing to provide enough vehicles and for withholding better-selling models. The Eighth Circuit found that, although the contract gave General Motors the discretion to provide any number of vehicles to the plaintiff, General Motors could nevertheless violate the duty of good faith and fair dealing by failing to exercise its discretion in good faith. *Id*.

Similarly, CIS alleges Defendants violated the duty of good faith and fair dealing by exercising their discretion to format invoices so as to undermine its the ability to consent to non-mandatory increases. Although the Service Agreement does not expressly require Defendants to inform CIS that an increase is optional rather than mandatory, Defendants are nevertheless required to make discretionary decisions in good faith. CIS has alleged Defendants exercised their discretion so as to deprive it of its contractual right to consent to rate increases. As such, CIS has adequately pled a breach of the covenant of good faith and fair dealing.

**C. Count III: Fraud in the Inducement**

Defendants next argue CIS's claim for fraud in the inducement should be dismissed because: 1) the claim is barred by the economic loss doctrine, 2) CIS fails to allege a misrepresentation, and 3) the complaint does not comply with the heightened pleading requirement of Fed. R. Civ. P. 9(b).

Economic Loss Doctrine

"The economic loss doctrine prohibits a plaintiff from seeking to recover in tort for economic losses that are contractual in nature." *Trademark Med., LLC v. Birchwood Labs., Inc.*,

22 F. Supp. 3d 998, 1002 (E.D. Mo. 2014); *Self v. Equilon Enterprises*, LLC, No. 4:00–CV–1903–TIA, 2005 WL 3763533, at *8 (E.D. Mo. Mar. 30, 2005). The doctrine exists to protect the integrity of the bargaining process, through which the parties have allocated the costs and risks. *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 223 F.3d 873, 882 (8th Cir. 2000).

The economic loss doctrine originated in cases arising under the Uniform Commercial Code ("UCC"). *Mea Fin. Enterprises, LLC v. Fiserv Sols., Inc.*, No. 13-05041-CV-SW-BP, 2013 WL 12155467, at *3 (W.D. Mo. Oct. 16, 2013); *see also Trademark Med., LLC v. Birchwood Labs., Inc.*, 22 F. Supp. 3d 998, 1002 (E.D. Mo. 2014). The Service Agreement is a contract for waste management services and does not arise under the UCC. The Missouri Supreme Court has not addressed the application of the economic loss doctrine to cases which arise outside of the UCC. However, the Court of Appeals for the Eighth Circuit has recently addressed the issue in *Dunne v. Resource Converting, LLC*, 991 F.3d 931, 943 (8th Cir. 2021).

*Dunne* involves the purchase of licenses to sell a system to dispose of waste. The plaintiff alleged the capabilities of the system were misrepresented and raised several tort claims. The Court applied Missouri's economic loss doctrine to the plaintiff's tort claims, including his fraud claims, arising out of the license agreements. The Eighth Circuit Court of Appeals reversed and remanded the claims, stating:

> As we explained in *Dannix Painting*, the economic loss doctrine "was judicially created to protect the integrity of the [UCC] bargaining process" by "prevent[ing] tort law from altering the allocation of costs and risks negotiated by the parties." 732 F.3d at 906 (citations omitted). Recently, in *Vogt v. State Farm Life Insurance Co.*, this Court declined to apply the doctrine under Missouri law to a conversion claim, noting that Missouri law has limited "this doctrine to warranty and negligence or strict liability claims." 963 F.3d 753, 774 (8th Cir. 2020) (collecting Missouri cases applying the doctrine to UCC claims). In *Vogt*, we found it proper to limit the doctrine to its "traditional moorings." *Id*. That rationale applies with equal force here, and, while there may be some circumstance where the Missouri Supreme Court would apply the doctrine outside the UCC, this is not the case. We find the courts which have found the doctrine

> does not apply in circumstances like these persuasive. *See, e.g., Steadfast Ins. Co. v. ARC Steel, LLC*, Case No. 16-3214-CV-S-SRB, 2019 WL 2090696, at *3 (W.D. Mo. May 13, 2019) (collecting cases declining to apply the doctrine to cases outside the UCC). We will not expand the economic loss doctrine beyond the contexts in which it has been applied by Missouri courts. We reverse the district court's application of the doctrine to bar Dunne's misrepresentation claims.

991 F.3d at 943 (footnote not included). Although there may be circumstances in which the economic loss doctrine bars tort claims where the underlying contract did not arise under the UCC, this is not such a case. The Court concludes that the doctrine does not apply to CIS's fraud claim.

Misrepresentation

Defendants next claim CIS has failed to identify any specific statement contained on the invoice that amounts to a misrepresentation. CIS responds that it has alleged a number of ways in which Defendants' communications misrepresent that Optional Increases are mandatory. First, the invoices list a "Total Amount Due" which CIS alleges includes Optional Increases. (Compl. at ¶ 169-170). CIS contends this amounts to a misrepresentation because the Optional Increases require consent and therefore are not due. Second, the invoices state that

> [I]f service is cancelled during a billing cycle, **you will remain responsible for all charges, fees and taxes through the end of the billing cycle**. You will not be entitled to proration of billing or a refund for the period between the notice of termination and the end of the current billing cycle.

*Id*. at ¶ 127 (emphasis in original). CIS claims this language implies the total bill, including optional increases, is mandatory. Third, CIS contends Defendants' practice of charging late fees on the total bill, including Optional Increases, misrepresents that those charges are mandatory. *Id*. at ¶¶ 115-121. CIS further alleges that

> Each monthly invoice sent by Defendants to Plaintiff and members of the Class which contained a consent-required charge which Defendants concealed among the mandatory charges constitutes a separate and distinct fraudulent

> misrepresentation intended by Defendants to deceive their customers into paying the consent-required charges without the customers knowing they were doing it.

*Id*. at ¶ 180. CIS has plausibly alleged that these statements by Defendants misrepresent the amount it is contractually obligated to pay.

<u>Heightened Pleading Standard</u>

Pursuant to Fed. R. Civ. P. 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The special nature of fraud does not necessitate anything other than notice of the claim; it simply necessitates a higher degree of notice, enabling the defendant to respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct. Thus, a plaintiff must specifically allege the "circumstances constituting fraud," *id*., including "such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir. 1982).

Defendants claim CIS has failed to meet these requirements because CIS has not specified what misrepresentation constituted fraud or where on the invoice the misrepresentation was made. As discussed above, CIS has pointed to a number of specific statements by Defendants that it claims constitute misrepresentations. CIS further alleges that Defendants intended to deceive customers into paying optional charges without consent. (Compl. at ¶ 180). This is sufficient to provide Defendants with notice of the claims against them. *See Nestle Purina PetCare Co. v. Blue Buffalo Co*., No. 4:14-CV-859 RWS, 2015 WL 1782661, at *11 (E.D. Mo. Apr. 20, 2015) (finding Rule 9 satisfied by "quite general" allegations that defendants "knew that

their published statements were false, or acted in reckless disregard [or negligence] of the truth or falsity of the statements."). As such, CIS has adequately pled Count III.

**D. Claims against Republic**

Defendants next argue that Counts I and II against Republic should be dismissed because it is not a party to the Service Agreement. CIS responds that it has alleged Republic is liable under alter ego and implied contract theories and that Republic acted as Allied's subagent in executing the contract. (Compl. at ¶ 99, 103-4). Defendants do not respond to CIS's alter ego, implied contract, or agency theories. By failing to respond to CIS's theories of alter ego, implied contract, and agency in their reply, Defendants may have conceded the point insofar as their motion to dismiss is concerned. *See Johnston v. Crawford*, No. 4:04-CV-1075-DJS, 2005 WL 1474022, at *3 (E.D. Mo. June 13, 2005). Moreover, CIS has sufficiently alleged that Republic may be liable under an alter ego theory.

"Under Missouri law, there is a presumption of corporate separateness, and courts do not lightly disregard the corporate form to hold a parent company liable for the torts of a subsidiary." *Iridex Corp. v. Synergetics USA, Inc.,* 474 F. Supp. 2d 1105, 1109 (E.D. Mo. 2007) (citation omitted). Thus, "[a] wholly owned subsidiary is generally treated as a separate entity." *Id.* (citation omitted); *see also Mid-Missouri Telephone Co. v. Alma Telephone Co.,* 18 S.W.3d 578, 582 (Mo. App. 2000).

"For this reason, [n]ormally a parent corporation is not responsible for the acts of its subsidiary corporation." *Mid-Missouri Telephone Co.,* 18 S.W.3d at 582 (internal quotations and citations omitted). "Of course, where circumstances exist that would allow the wronged party to

pierce the corporate veil, a parent corporation could then incur liability, thus losing the parent/subsidiary distinction." *Id.* (citation omitted). Missouri courts will "pierce the corporate veil" and hold a defendant liable for the torts of another corporation under the alter ego rule if the plaintiff can establish:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
> (2) such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Greater St. Louis Const. Laborers Welfare Fund v. Mertens Plumbing and Mechanical, Inc.,* 552 F. Supp. 2d 952, 955 (E.D. Mo. Dec.13, 2007) (citations omitted).

CIS has alleged that "Republic completely controls and dominates Allied as a shell company," such as by making all decisions, advertising and soliciting new customers for Allied in its own name, sharing common management, and operating out of the same headquarters. (Compl. at ¶¶ 99-100). CIS further claims this control is exercised "for the improper purpose of financially benefitting from Allied's contractual arrangements with customers while attempting to insulate itself from direct liability to those customers." *Id*. at ¶ 99. Moreover, whether Republic may be liable under an alter ego theory is a factual inquiry that is not usually proper at the motion to dismiss stage. *See Cass Com. Bank v. Cap. Tech. & Leasing, LLC*, No. 4:14-CV-307 RWS, 2015 WL 4775102, at *3 (E.D. Mo. Aug. 13, 2015) (Application of alter ego theory is "fact-intensive" and should normally be left to the finder of fact). CIS has sufficiently alleged that Allied acted as the alter ego of Republic. Because the Court concludes that CIS has properly pled that Allied acted as the alter ego of Republic, it need not address CIS's other arguments.

**E. <u>Conclusion</u>**

For the reasons set forth above, the Court concludes that CIS has adequately pled its claims against both Republic and Allied. Accordingly,

**IT IS HEREBY ORDERED** that Republic Services, Inc. and Allied Services, LLC's Motion to Dismiss [15] is **DENIED**.

Dated this 8th day of October, 2021.

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE