**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CIS COMMUNICATIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 4:21-cv-00359-JAR |
| vs. | ) | |
| | ) | |
| REPUBLIC SERVICES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiff's motion for class certification in this action

for breach of contract and related claims. (Doc. 94). For the reasons stated below, the Court will

grant the motion in part and amend the class period to January 1, 2014, through December 31,

2016.

**BACKGROUND**

Plaintiff CIS Communications is a wireless telecommunications site development

company headquartered in St. Louis County, Missouri. Defendants Republic Services (RSI) and

its subsidiary Allied Services (Allied) provide waste removal services for commercial, industrial,

and residential customers. In May 2005, Plaintiff signed a Customer Service Agreement (CSA)

for waste removal services with Allied's predecessor in interest, Midwest Waste (collectively

Allied). The agreement established a basic service rate of $44 per month, with a rate adjustment

clause permitting Allied to increase the rate unilaterally for certain specific reasons or for any

other reason with Plaintiff's consent. It states:

> **RATE ADJUSTMENTS**. Because disposal and fuel costs constitute a significant
> portion of the cost of Midwest Waste's services provided hereunder Customer
> agrees that Midwest Waste may increase the rates hereunder proportionately to
> adjust for any increase in such costs or any increases in transportation costs due to

changes in location of the disposal facility. Customer agrees that Midwest Waste may also increase the rates from time to time to adjust for increase in the Consumer Price Index, and Customer agrees that Midwest Waste may also proportionately pass through to Customer increases in the average weight per container yard of the Customer's Waste Materials, increase in Midwest Waste's costs due to changes in local, state or federal rules, ordinances or regulations applicable to Midwest Waste's operations or the services provided hereunder, and increases in taxes, fees or other governmental charges assessed against or passed through to Midwest Waste (other than income or real property taxes). Midwest Waste may only increase rates for reasons other than those set forth above with the consent of the Customer. Such consent may be evidenced verbally, in writing or by the actions and practices of the parties.

(Doc. 95-7). Payments were due within ten days of the invoice, and late payments were subject to late fees.

According to the complaint, from 2005 to 2018, the basic service charge billed to Plaintiff increased incrementally from $44 per month to $328.19 per month for the same service. Allied never provided any explanation for these increases or indicated whether they corresponded to unilateral reasons or required consent; the invoice line item "Basic Service" simply escalated over time. (Doc. 95-18). In August 2018, Plaintiff complained, and Allied offered to reduce the monthly rate to $55. Suspecting that Allied had been raising rates without contractual justification or consent since the beginning, Plaintiff terminated the agreement and commenced this putative class action asserting claims of breach of contract, breach of the covenant of good faith and fair dealing, fraudulent inducement, and unjust enrichment.

Plaintiff's first complaint was filed concurrent with an identical case filed by another Allied customer, Pietoso, Inc., d/b/a Café Napoli, for a different class period.[1]  The central issue in both cases is whether Defendants' price increases complied with the terms of the plaintiffs' respective CSAs. This Court declined to consolidate the two cases due to perceived differences

---

[1]  See *CIS Communications, LLC v. Republic Servs., Inc.,* No. 4:19-CV-00389-JAR, and *Pietoso, Inc., d/b/a Café Napoli, v. Republic Services, et al.*, Case No. 4:19-cv-00397-JAR.

in the plaintiffs' contracts.[2] The Court (J. White) later dismissed *Pietoso*, finding that plaintiff Pietoso consented to the rate increases by continuing to pay monthly invoices for eight years. *Pietoso, Inc. v. Republic Servs., Inc.*, No. 4:19-CV-397 RLW (Doc. 32), 2020 WL 224516, at *1 (E.D. Mo. Jan. 15, 2020). In light of that ruling, this Court dismissed the parallel cased filed by CIS.[3] However, the Eighth Circuit subsequently reversed in *Pietoso*, reasoning that consent by conduct couldn't be determined at the pleading stage, and the more reasonable inference was that Pietoso simply assumed that the increases were for unilateral reasons and thus it was obligated to pay. (Doc. 42); *Pietoso, Inc. v. Republic Servs., Inc.*, 4 F.4th 620, 623-24 (8th Cir. 2021) ("It is common sense that people are not inclined knowingly to consent to being economically gouged.").[4] Plaintiff CIS then re-filed its complaint in the present case, and both cases proceeded with shared discovery.

Although Plaintiff requested discovery for the entire class period beginning in 2005, Defendants objected and limited shared production to 2013 to 2023. Plaintiff's counsel didn't press the issue, opting to litigate motions to compel only in *Pietoso*. Defendants produced voluminous data files reflecting their pricing and invoicing practices from 2013 to 2023. Various depositions, summarized by Plaintiff's expert, Patrick Kilbourne,[5] establish that RSI uses a cloud-based pricing tool called Capture to provide controls over the price quoting process

---

[2]    *CIS Communications, LLC v. Republic Servs., Inc.,* No. 4:19-CV-00389-JAR (Doc. 27), 2019 WL 2075892, at *1 (E.D. Mo. May 10, 2019).

[3]    *CIS Communications, LLC v. Republic Servs., Inc.*, No. 4:19-CV-00389-JAR (Doc. 40), 2020 WL 1332076, at *1 (E.D. Mo. Mar. 23, 2020).

[4]    Throughout this order, citations are cleaned up and internal citations are omitted.

[5]    Defendants seek to exclude Kilbourne's expert opinions under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  The Court denies that motion in a separate order issued concurrent herewith, limiting Kilbourne's testimony to the amended class period 2014 through 2016.

nationwide. (Doc. 94-16 at 9; Doc. 94-20 at 8-15). Customer and contract information is collected in Capture and transferred to RSI's customer management and billing system called InfoPro. (*Id.*) Defendants increase their prices every 10-12 months through a Yield Management Process (YMP). YMP increases are coded as such in Defendants' InfoPro database beginning in January 2014. At the top, parent company RSI uses multiple internal data points to generate budget guidance for its subsidiaries by geographic area. Sometime in 2016, RSI developed an algorithm to automate this process, marking the separation between the *CIS* and *Pietoso* class periods. The algorithm incorporates local division budgets, costs, and historical average price increases as well as individual customer histories, including prior increases, responses thereto, and profitability. Prior to 2016, YMP recommendations were generated manually in a process that emulated aspects of the algorithm. (Doc. 94-5 at 11). As relevant to the present pre-algorithm case, RSI provided YMP price increase recommendations to area-level directors, who then set targets for each area business unit. (Doc. 108-11). Business units built their budgets based on these targets. (Doc. 94-2 at 8-9; Doc. 104-17 at 5-6). Each unit was expected to meet its overall price increase target, but they retained discretion to decide which customers receive price increases and at what amount. (Doc. 94-20 at 11; Doc. 94-12 at 10-11).

When a customer objects to an increase, account representatives are trained to provide an explanation to convince the customer to accept the new rate. (Doc. 94-13). If a customer continues to resist, then the rate can be renegotiated. If one customer's rate increase must be adjusted downward, the difference is applied to other customers to achieve the target budget goal. (Doc. 94-12 at 12). As one area director instructed her team, "as long as you meet the [price increase] goal, it really doesn't matter how you get there." (Doc. 94-8 at 6). Another sales supervisor explained, "we had to get to a certain number. … So, you may adjust one, but you

have to get that number somewhere." (Doc. 94-12 at 11-12). A reduction for one customer necessitates a higher increase for another to make up the difference. (*Id.*)

In sum, each business unit meets its price increase target by spreading rate hikes among its customers based on their individual tolerance. Defendants do not and could not provide customers with an itemization of cost increases corresponding to the unilateral Rate Adjustment categories listed in the CSA,[6] nor do Defendants' invoices indicate what portion of an increase is attributable to those categories versus any additional margin requiring consent. Defendants charge additional fuel and environmental fees as a percentage of the underlying service charge. Plaintiff asserts that these fees are pure profit in that Defendants' actual costs for these categories are already incorporated into their basic service increases. Defendants deem payment to constitute consent to the totality of any price increase. (Doc. 94-5 at 4).

In the instant motion, Plaintiff originally sought to certify a class consisting of all Missouri commercial and industrial customers who had a service agreement with any Defendant entity and paid more than the original rate for the period from May 24, 2005 (the date of Plaintiff's contract) to December 31, 2016. In its parallel motion, Pietoso sought to certify a class beginning January 1, 2017, after Defendants implemented the algorithm. In response to Plaintiff's motion in the present case, Defendants argue that changes in the CSA template over time and rate restrictions negotiated by individual customers preclude class treatment. (Doc. 104-1). In reply, Plaintiff asserts that the standard CSA didn't materially change with respect to rate adjustment categories during the period, and Defendants' database identifies rate-restricted

---

[6]     For example, Defendants don't identify cost line items for recycling, sorting, processing, and related costs, though these are a separate contractual basis for cost increases in one version of the CSA rate adjustment clause. (Doc. 94-17 at 6).

customers so they can easily be excluded from the class. (Doc. 124). Out of caution, Plaintiff redefines the proposed class as follows:

> From May 24, 2005 to December 31, 2016, all Missouri commercial and industrial customers that had a Service Agreement with Defendants or Defendant's subsidiaries and affiliates, and who paid any amounts in excess of the original price in the Service Agreement. Excluded from the Class are those customers whose Rate Adjustment provision was subject to a rate restriction.

Even with these limitations, Defendants' objections to class certification persist. Principally, they argue that (1) the record lacks evidence to support class certification before 2015, (2) the class includes customers with different versions of the CSA template, (3) the price increase process is highly individualized, and (4) consent requires an examination of varied customer experiences.

## LEGAL STANDARDS

Rule 23(a) allows individuals to sue on behalf of a class if: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law and fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy). Fed. R. Civ. P. 23(a).

If the foregoing criteria are satisfied, Rule 23(b)(3) permits a class action when the court finds that (1) questions of law or fact common to class members predominate over any questions affecting individual members (predominance) and (2) a class action is superior to other methods for fairly and efficiently adjudicating the controversy (superiority). Fed. R. Civ. P. 23(b)(3). Relevant considerations include (A) class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any related litigation already pending; (C) the desirability of concentrating claims in the forum; and (D) likely

difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D). "An individual question is one on which evidence varies from member to member; a common question is one where the same evidence suffices for each member to make a *prima facie* showing." *Ford v. TD Ameritrade Holding Corp.*, 115 F.4th 854, 859 (8th Cir. 2024).

## ANALYSIS

### Class Period

As a preliminary matter, although Plaintiff proposes a class period of 2005 through 2016, the record lacks evidence to support certification prior to 2014. While the record contains sample contracts dating back further (Doc. 104-31), Defendants produced financial data only from February 2013 through 2023, enabling Plaintiff's damages expert, Patrick Kilbourne, to evaluate damages only for those years. It is unclear whether earlier data still exists, much less in a format compatible with Kilbourne's methodology. The Court cannot assume that it does.

The evidence indicates that Defendants began coding YMP increases as such in their InfoPro database beginning in January 2014. Thus, as further discussed in the Court's *Daubert* order, the Court finds Kilbourne's method of identifying class members and evaluating damages reliable, and his testimony therefore admissible, with respect to the period January 1, 2014, through December 31, 2016. The Court will limit the class period accordingly and applies the Rule 23 standards below to the evidence available for the amended period.

### Numerosity

Rule 23(a)(1) requires that the members of a class be so numerous as to make joinder impractical. Fed. R. Civ. P. 23(a)(1). Based on Defendants' data, Plaintiff's expert Kilbourne was able to identify approximately 17,000 Missouri customers who received YMP increases

from 2013 through 2016, including 15,000 customers of Allied.[7] Though Defendants cursorily question ascertainability (Doc. 104-1 at 25 n.9), the Court finds this criterion satisfied.

**<u>Commonality</u>**

Rule 23(a)(2) requires that the members of a class be united by a common question of law or fact. Fed. R. Civ. P. 23(a)(2). "Commonality requires a showing that class members have suffered the same injury." *Powers v. Credit Mgmt. Servs., Inc.*, 776 F.3d 567, 571 (8th Cir. 2015). What matters is the capacity of a class action to generate common answers to resolve the litigation. *Id.* The common contention "must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Webb v. Exxon Mobil Corp.*, 856 F.3d 1150, 1156 (8th Cir. 2017).

In support of its motion, Plaintiff articulates multiple questions common to all class members concerning, in sum, (1) whether Defendants' price increase practices comport with the Rate Adjustment clause of customer contracts, and particularly whether the increases correspond to enumerated unilateral justifications or instead require consent, and (2) the nature of Defendants' invoice representations with respect to amounts owed, specifically whether payment was mandatory or partially optional. In response, Defendants argue that commonality is lacking because there is no single uniform contract; rather, Defendants' customers signed different

---

[7]      In its complaint, Plaintiff alleges that RSI is liable as the alter ego of Allied. (Doc. 1 at 19-21). Defendants challenge this premise, but the Court need not decide this fact issue on a motion for class certification. The evidence is sufficient to certify the class as to both defendants. *See, e.g., Sheinhartz v. Saturn Transp. Sys., Inc.*, 2002 WL 575636, at *3 (D. Minn. Mar. 26, 2002) (where all plaintiff contracts were with one of two defendants).

versions of the CSA with different Rate Adjustment terms depending on which template was used at the time.

<u>Breach of Contract (Count I)</u>

The evidence in the record generally confirms that Defendants use a standard form for industrial and commercial customers, but it does reflect some variation in the CSA template over the years. For example, Plaintiff CIS's contract contains essentially the same Rate Adjustment categories as Pietoso's (i.e., disposal and transportation costs, Consumer Price Index (CPI), weight, and changes in the law) but with the additional concept of proportionality and without the fuel and environmental recovery fees in the Payment clause. This is why the Court denied consolidation at an earlier stage, anticipating that these differences would be material to the central issues in each case. Discovery revealed other versions of the CSA containing an additional category of unilateral increase justification for costs related to recyclable waste. (e.g., Doc. 94-17 at 6). In short, not all contracts within the putative class are identical, but the foregoing categories comprise the universe of substantive variations, minor wording aside. However, contrary to the Court's earlier assumption, discovery also revealed that the differences are largely irrelevant to the YMP price increase process, which doesn't track or apply *any* of the categories in a discernable manner. Shared discovery shows that, in 2017, Defendants adopted an algorithm to automate YMP recommendations previously generated manually with less precision. (Doc. 94-2 at 48; Doc. 94-4 at 13; Doc. 94-5 at 11; Doc. 94-28 at 10-11). The creator of the algorithm, James Shrenk, testified that he didn't review a form contract when he designed the algorithm, and CPI isn't part of the formula. (Doc. 94-4 at 37). Globally, the evidence suggests that Defendants have never specifically tracked contractual cost categories when increasing prices. What *is* uniform and common to the class, Plaintiff asserts, is Defendants'

9

disregard for all contractual Rate Adjustment terms in its YMP recommendations and downstream business practices.

From here, Defendants argue that their practices aren't uniform in that each business unit makes independent decisions about how much to charge which customers in order to meet its overall price increase target, and the imposition of increases is highly individualized. To support this assertion, Defendants submit managers' declarations describing their local practices. (e.g., Doc. 104, Ex. 17, 18). But this evidence appears to validate Plaintiff's central theory that Defendants' business units and divisions uniformly ignore the terms of customer agreements and raise prices based on other factors such as customer tolerance and profitability. (Doc. 104-17). One manager admitted, "I will inform customers that some increases were not expected when their contract was signed." (Doc. 104-18, ¶ 8). And internal talking points instruct representatives to attribute price increases to the costs of labor, workers compensation, and health care (Doc. 94-13), none of which are listed in any Rate Adjustment clause.

If a fact finder deems Defendants' YMP price increase method to constitute a breach of the CSA, it would be so for all customers in the class, regardless of which version they signed.[8] Minor variations would impact only the amount of individual damages, which doesn't preclude class certification on the common question of liability as long as a damages model can be applied uniformly across the class. *Meek v. Kansas City Life Ins. Co.*, 126 F.4th 577, 584 (8th Cir. 2025). Here, Kilbourne remarked on the standardized format of the data, indicating a level of uniformity throughout Defendants' organizational chart. (Doc. 94-16 at 9). His report confirms the feasibility of calculating individual customers' damages in a uniform manner using Defendants'

---

[8]     To clarify, the Court is not opining on this ultimate issue. A jury might instead find that the unilateral increase categories are indirectly incorporated into YMP increases in a manner sufficient to comply with the Rate Adjustment clause, or that customers consented by payment. The point is that any such findings would apply to the whole class.

10

costs, pricing, and payment data for the amended class period of January 1, 2014 (when Defendants began coding YMP increases in their database) through December 31, 2016.

The Court acknowledges that other district courts have denied certification in similar cases against Defendants where the putative class comprised customers in multiple states with different state laws. *Buffalo Seafood House LLC v. Republic Servs., Inc.*, 2024 WL 4608308, at *1 (D.S.C. Oct. 28, 2024); *CLN Props., Inc. v. Republic Servs., Inc.*, 2010 WL 5146734 (D. Ariz. Dec. 13, 2010). In *Buffalo Seafood*, the court cited differences in state laws regarding the use of extrinsic evidence and the defense of consent by payment. 2024 WL 4608308, at *4. In *CLN Properties*, the court cited state law differences as well as contract variations and individualized facts with respect to customer communications and consent by payment. 2010 WL 5146734, at *2-10. Defendants also cite *In re Express Scripts, Inc.*, 2015 WL 128073, at *4 (E.D. Mo. Jan. 8, 2015), and *O'Shaughnessy v. Cypress Media, L.L.C.*, 2015 WL 4197789, at *7 (W.D. Mo. July 13, 2015), where the courts found that variations in the contracts in question precluded class certification.

But here, unlike *Buffalo Seafood* and *CLN Properties*, all potential plaintiffs in this case are Missouri customers, and Missouri law will apply to their substantive claims. Further, as previously stated, the Court now understands that discrete variations in the CSA template – such as whether the rate adjustment clause mentions recyclable waste – don't affect the common question of liability because none of the unilateral increase categories correlate to Defendants' YMP price increase process in any discernable fashion. If a jury finds Defendants' practice to breach class members' contracts in this manner, then it would be a breach of virtually every version of the CSA in effect during the class period. The only difference would be damages. On the present facts, the more instructive case is *Custom Hair Designs by Sandy v. Cent. Payment*

11

*Co., LLC*, 984 F.3d 595 (8th Cir. 2020). There, customer contracts were negotiated by independent agents and contained some variations in terms and pricing, which were subject to negotiation. *Id*. at 599-602. As here, the defendant communicated billing changes on nearly identical statements. The plaintiff customers alleged that the defendant inflated fees without authorization. The defendant argued that contract variations and individual negotiations precluded class treatment.  The Eighth Circuit disagreed, reasoning that questions of law and fact predominated, and slight variations affected only damages, which would be calculated using the defendant's own database. *Id*. at 601-602.

Even more notably on-point is *In re Stericycle, Inc.*, 2017 WL 635142, at *1 (N.D. Ill. Feb. 16, 2017), where a waste disposal company used an automated price increase (API) process to raise customers' rates seemingly arbitrarily, without contractual justification. As here, the defendant argued that contracts varied and individual customers negotiated their rates differently. The court rejected those arguments, reasoning that contractual differences were either inconsequential or outliers that could be eliminated, and that the defendant had a uniform way of responding to complaints. *Id*. at *6.  "While Stericycle points to several differences, it ultimately does not defeat Kilbourne's conclusion that the APIs in no way lined up with the increase in Stericycle's costs. … Even if APIs do not apply equally to every class member and even if not every member has exactly the same [contract] provision … there is plainly enough to establish common conduct resulting in a common injury, capable of class resolution." *Id*.

Such is the case here, too. Based on markers in Defendants' data files, expert Kilbourne was able to identify Missouri customers with signed, unrestricted contracts for basic service who were subject to YMP increases during the class period. (Doc. 94-16 at 13-14). He demonstrated the ability to identify Plaintiff's YMP price increases, separate fuel and environmental recovery

fees, and exclude instances where invoice amounts weren't fully paid (signaling renegotiation). (*Id*. at 24-25). While some outliers may require exclusion,[9] the Court is satisfied that the central relevant facts are sufficiently common and the question of liability is common to putative class members, and that individual damages can be ascertained uniformly from Defendants' cost and pricing data.  The same commonalities and uniform damages model support Plaintiff's other claims as well.

<u>Covenant of Good Faith and Fair Dealing (Count II)</u>

"A party breaches the covenant of good faith and fair dealing if it exercises a judgment conferred by the express terms of the agreement in a manner that evades the spirit of the agreement and denies the movant the expected benefit of the agreement." *Glenn v. HealthLink HMO, Inc.*, 360 S.W.3d 866, 877 (Mo. App. E.D. 2012). "The purpose of the covenant of good faith is to prevent opportunistic behavior where one party exploits changing economic conditions to the detriment of the other party." *Id*.

Here, Plaintiff alleges that Defendants' standard invoice led customers to believe that the entire amount due was mandatory and subject to late fees and other enforcement remedies, when in fact at least a portion required consent. Though Defendants argue that this claim would require individualized inquiries regarding customer expectations, the Court disagrees. As the Eighth Circuit reasoned in *Pietoso*, it defies common sense to think that Plaintiff voluntarily paid more than it was contractually required to pay; rather, it paid because it thought it had to. *Pietoso*, 4 F.4th at 624. Following the Eighth Circuit's logic, the Court doesn't believe that class members' contractual expectations would vary in this regard such that individual inquiry would

---

[9]      For example, there may be some customers whose contracts permit price increases "to achieve or maintain an acceptable operating margin as determined in the Company's sole discretion." (Doc. 108-20 at 24, 32). This language was widely adopted in 2021 but does not appear prevalent during the class period. (Doc. 108-20).

be necessary. Invoices are standard, containing one line item for service and no explanation. Defendants' web page titled "Understanding your Rates" informs customers that any rate increase will comply with their contracts and that late payments will be subject to an additional fee. (Doc. 94-6 at 3). The Court is satisfied that the questions of fact and law relevant to this claim will be common to all class members.

       Fraudulent Inducement (Count III)

       A claim for fraudulent inducement requires a material and false representation by a speaker who knows of the falsity and intends that it be acted on; the hearer's ignorance of the falsity of the representation; the hearers right to rely and actual reliance on it; and resulting injury. *SBFO Operator No. 3, LLC v. Onex Corp.*, 101 F.4th 551, 557 (8th Cir. 2024). Plaintiff asserts that Defendants knowingly made a false representation on every invoice by indicating a mandatory amount due, when in fact at least a portion of the amount required consent.

       Defendants argue that the elements of customer ignorance and reliance can't be established through class-wide proof because customers have different interactions with their sales representatives and sometimes renegotiate their rates. Defendants cite *Hudock v. LG Elecs. U.S.A., Inc.*, 12 F.4th 773, 776 (8th Cir. 2021), where the Eighth Circuit reversed certification of a class of television buyers because class-wide evidence couldn't establish whether customers actually read and relied on a fact tag falsely claiming a certain product specification. Defendants also cite *Johannessohn v. Polaris Indus. Inc.*, 9 F.4th 981, 985 (8th Cir. 2021), where the Eighth Circuit affirmed the denial of certification of a class of ATV buyers because the manufacturer presented evidence that individual customers didn't rely on an omission about a product defect.

       In the Court's view, however, the more instructive case on the present facts is *Boswell v. Panera Bread Co.*, 311 F.R.D. 515, 531 (E.D. Mo. 2015), *aff'd*, 879 F.3d 296 (8th Cir. 2018),

which involved uniform representations in a form contract. There, as here, the central issue was whether the defendant breached the agreement and, on the fraud claim, whether the defendant intended to comply with the provision at issue. The court found these questions capable of common resolution because every class member signed the same contract, and the defendant either did or didn't intend to comply with it at the time of execution. *Id*. at 531. The same is true here. Customers signed CSAs with substantially similar Rate Adjustment provisions and received a standard invoice with a single line item showing the total amount due for service. Unlike *Hudock*, a jury could logically infer that every customer necessarily read and relied on the invoice in order to pay the stated amount due. Defendants treat the full amount as mandatory by applying penalties to late payments. A jury could find from the common evidence that Defendants uniformly didn't intend to comply with the Rate Adjustment clause and misrepresented on each invoice that the entire amount was mandatory. Or the jury could reach the opposite conclusion. Either way, the Court is satisfied that the questions of fact and law relevant to this claim will be common to all class members and resolved from common evidence.

<u>Unjust Enrichment (Count IV)</u>

Plaintiff asserts this claim in the alternative to its contract claims, as unjust enrichment will not lie where there is a contract addressing the same subject matter. *Amalaco, LLC v. Butero*, 593 S.W.3d 647, 653 (Mo. App. E.D. 2019). The elements of unjust enrichment in Missouri are: (1) the defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it would be unjust to allow the defendant to retain the benefit. *Custom Constr. Sols., LLC v. B & P Constr., Inc.*, 684 S.W.3d 148, 166 (Mo. App. E.D. 2023). As a part of the first element, the plaintiff must show the amount of the benefit conferred on the defendant. *Id*.

Plaintiff alleges that Defendants were unjustly enriched at the expense of customers by raising prices and collecting payments in excess of amounts permissible under the Rate Adjustment clause. Defendants argue that this claim is unsuitable for class treatment because a determination of unjustness would depend on individual circumstances, such as a customer's understanding and expectations and what they received in return. The Court does not agree. All customers received waste removal services. As with Plaintiff's contract claims, a jury could determine from the common evidence whether Defendants charged and collected more for those services than customers' contracts allowed. And while an unjust enrichment claim examines the defendant's conduct and not the plaintiff's, *Hale v. Wal-Mart Stores, Inc.*, 231 S.W.3d 215, 226 (Mo. App. W.D. 2007), a jury could also find from late penalties or infer from common sense that customers understood the amounts on their invoices to be mandatory. *Pietoso*, 4 F.4th at 623-24. The only individual difference would be in the amount of damages, which can be ascertained from Defendants' data. Contrary to Defendants' contention, this count is not inherently incapable of class treatment. *See, e.g., Cope v. Let's Eat Out, Inc.*, 319 F.R.D. 544, 555 (W.D. Mo. 2017) (where employees claimed unjust enrichment related to wage violations); *Hale*, 231 S.W.3d at 225-26 (same).

The Court finds that commonality is established for each of Plaintiff's claims.

**<u>Typicality</u>**

Rule 23(a)(3) requires that the named plaintiff's claims are typical of the class. Fed. R. Civ. P. 23(a)(3). "Typicality is fairly easily met so long as other class members have claims similar to the named plaintiff." *Postawko v. Missouri Dep't of Corr.*, 910 F.3d 1030, 1039 (8th Cir. 2018). "Factual variations in the individual claims will not normally preclude class

16

certification if the claim arises from the same event or course of conduct as the class claims and gives rise to the same legal or remedial theory." *Id*.

Defendants argue that Plaintiff isn't typical of the proposed class because customer contracts vary, and Plaintiff's experience is unique in that it allowed its 2-year contract to auto-renew 11 times before complaining. The Court does not agree. As previously stated, on review of the Rate Adjustment clauses in the record (Doc. 94-17; Doc. 108-20) and with a better understanding of Defendants' practices, the Court finds the substantive variations finite and largely detached from Defendants' YMP price increase model. All class members were subject to the same YMP increases and invoicing as Plaintiff. Based on the global evidence, the Court can reasonably infer for purposes of this motion that Plaintiff's historical experience was quite common. Again, if a jury finds Defendants' practices to breach customer contracts in this manner, it would be so for all, and individual differences would affect only the amount of damages.

The Court finds that Plaintiff's experience and resulting claims are typical of the class.

## **Adequacy**

Rule 23(a)(4) requires that the named plaintiffs adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). The adequacy factor serves "to ensure due process for absent class members, who generally are bound by a judgment rendered in a class action." *Rattray v. Woodbury Cty., Iowa*, 614 F.3d 831, 835 (8th Cir. 2010). Class representatives and their attorneys must be able and willing to prosecute the action competently and vigorously, and each representative's interests must be sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge. *Cromeans v. Morgan Keegan & Co., Inc.*, 303 F.R.D.

543, 553 (W.D. Mo. 2014). "The experience and capability of the representative's counsel bears upon the adequacy of the representative." *Rattray*, 614 F.3d at 836.

On this factor, Defendants argue that Plaintiff cannot adequately represent the interests of the class because Plaintiff failed to develop the evidence for the entire class period. But Defendants refused to produce discovery prior to 2013, and the class period will be limited accordingly. Given the totality of the evidence, the Court is satisfied that Plaintiff is a typical customer with interests similar to those of the amended class and unlikely to diverge. The Court finds that Plaintiff will adequately represent the interests of the class.

Likewise, Plaintiff's lead counsel in this matter have successfully litigated numerous class actions (Doc. 94-19) and have consistently demonstrated their expertise in the present matter. Defendants do not argue otherwise.

The Court is confident that Plaintiff's interests are aligned with the putative class and its counsel competent to prosecute the action.

### **Predominance**

"Predominance gauges the relationship between common and individual questions in a case." *Custom Hair Designs*, 984 F.3d at 601. "The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 374-75 (8th Cir. 2018). "Certification is appropriate if the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues. *Id*. at 375. A class may be certified based on common issues even when some matters will have to be tried separately, such as damages or affirmative defenses peculiar to individual class members. *Id*. Predominance "requires an

18

analysis of whether a prima facie showing of liability can be proved by common evidence or whether this showing varies from member to member." *Boswell*, 311 F.R.D. at 529.

As with commonality and typicality, Defendants argue that individual issues outweigh common issues because customer contracts, invoice amounts, and the defense of consent vary from one customer to another. The Court remains unpersuaded of this theory. Defendants' YMP pricing and invoicing practices applied to all customers in the class. The question for the fact finder as to whether those practices breach the Rate Adjustment clause, or whether payment constitutes consent, will be common to all of them. *See Boswell*, 311 F.R.D. at 530 (reasoning that defendant's theory of defense would succeed or fail for the whole class); *Stericycle*, 2017 WL 635142, at *8 (finding that common issues stemming from defendant's automatic price increase process predominated). Similarly, fraud claims based on uniform misrepresentations can be proved through common evidence and reasonable inferences therefrom and thus are appropriate for class certification. *Boswell*, 311 F.R.D. at 530-31. The Court does not believe that individual customers' communications with their sales representatives undermine this factor, as the evidence establishes a uniform business practice for resolving customer inquiries and complaints. To wit, when a customer complains about a rate hike, representatives offer a "cost of doing business" explanation that may or may not correlate to contractual justifications, and if the customer continues to object, then his rate is reduced and offset by increases to other customers. (e.g., Doc. 94-12 at 12; Doc. 94-13; Doc. 104-17, 18). *See Stericycle*, 2017 WL 635142, *8 ("As for their fraud claim, plaintiffs have shown a standardized pattern of misrepresentations (over and above the verifiable contract breaches)…").

The Court acknowledges that some courts have denied class certification where defendants cited plaintiffs' individual communications with sales representatives. *CLN*

*Properties*, 2010 WL 5146734, at *7; *Adams v. Kansas City Life Ins. Co.*, 192 F.R.D. 274, 279 (W.D. Mo. 2000). In this Court's view, however, what matters is whether Defendants' practices complied with their contracts. Predominance can be satisfied even where a uniform practice is not applied identically to each class member. *Stericycle*, 2017 WL 635142, at *8. The Court again finds authority in *Custom Hair Designs* for the same reasons discussed above with respect to commonality. 984 F.3d at 599-602. In that case, although there were some variations in contracts and individual negotiations, invoices were nearly identical, and the Eighth Circuit found questions of law and fact to predominate, with individual damages ascertainable using the defendant's data. *Id.* at 601-602. Such is the case here, too. A jury need not hear the particulars of every customer conversation or outcome. Defendants' database markers permit the exclusion of "restricted" customers not subject to YMP increases and customers with materially different contract terms.  (Doc. 94-20 at 48; Doc. 94-16 at 13). Even if a jury were to find that customers who renegotiated their rates consented to all or some of an increase, peculiar affirmative defenses don't preclude class treatment.[10] *Stuart*, 910 F.3d at 374-75. If anything, this common scenario provides "an additional link of commonality" among a subset of the class who renegotiated their rates, as was Defendants' standard practice for resolving customer complaints. *See, e.g., Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 45 (E.D.N.Y. 2008) (granting class certification on claims of misrepresentation, breach of contract, and unjust enrichment and noting that an affirmative defense common to the class would not destroy predominance).

The Court also does not believe that individual inquiry is necessary with respect to class members like Plaintiff who simply paid their bills without question. Defendants cite *Stuart v. Global Tel*Link*, where the Eighth Circuit upheld decertification of a class of inmates who

---

[10]    This also applies to Defendants' cursory argument on the defense of waiver.

voluntarily paid excessive telephone rates. *Stuart v. Glob. Tel\*Link Corp.*, 956 F.3d 555, 561 (8th Cir. 2020) (finding no abuse of discretion). But a court "must examine in each particular case how the voluntary payment doctrine issue may impact the common issues of law and fact." *Dupler*, 249 F.R.D. at 45. Here, the Eighth Circuit has recognized that Defendants' standard invoice presents the total amount due as mandatory, and people generally don't consent to being gouged.[11] *Pietoso*, 4 F.4th at 623 n.4, 624.

Based on the evidence in the record on the present motion, the Court discerns no significant individual issue beyond damages and finds that common issues predominate in that Plaintiff's theories of liability will succeed or fail for the whole class.

**Superiority**

The second inquiry under Rule 23(b)(3) requires courts to determine whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy," considering: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

---

[11]    This also applies to Defendants' cursory argument on the defense of failure to mitigate and a more substantive argument regarding the statute of limitations. Plaintiff originally filed this case on March 1, 2019. Given the amended class period beginning January 1, 2014, all class claims are clearly within the 5-year statute of limitations except arguably for the first two months of the class period, when ascertainability must be examined. Plaintiff asserts that its injury wasn't ascertainable until it complained about its invoice and was offered a significant discount, leading it to suspect that previous rate hikes were arbitrary, so the last item of damage was the final invoice. Plaintiff also alleges that Defendants' standard form invoice concealed its breaches and thus warrants tolling of the statute of limitations. To the extent these threshold determinations affect the viability of Plaintiff's claims for January 1 to February 28, 2014, the result will be the same for the entire class.

Considering these factors, the Court readily finds that a class action is a superior method of resolving the claims of potentially 17,000 customers. There is no evidence that other individual customers have brought or wish to bring suit in Missouri, and this is the proper forum for the case. Despite Defendants' insistence that individual issues would render class litigation unmanageable, the Court is convinced that the case can be presented to the jury with common evidence and that damages can be ascertained from Defendants' pricing and invoicing data.[12]

## CONCLUSION

Based on the common evidence, a jury could find that Defendants failed to comply with the Rate Adjustment clause of all class members' contracts during the amended class period. The Court finds that questions of law and fact common to the proposed class predominate over any individual matters, that Plaintiff's claims are typical for Defendants' customers such that it can adequately represent them, and that a class action is the superior method to resolve their common claims. This matter is therefore appropriate for class adjudication, and Plaintiff's motion to certify the class will be granted in part, with an amended class period and additional minor revisions to the definition for clarity. Pursuant to Rule 23(g), the Court will appoint Plaintiff's counsel as counsel for the class.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's motion for class certification is **GRANTED in part**. (Doc. 94). The class shall consist of:

All Missouri commercial and industrial customers who had a Service Agreement with Defendants or their subsidiaries and affiliates at any time from January 1, 2014, to December 31, 2016, and who paid any amounts in excess of the original

---

[12]    The Court acknowledges that there could be substantial overlap in the *Pietoso* and *CIS* classes insofar as long-term customers may have received price increases during both class periods. This, too, is merely an issue of damages, which would be calculated separately for each period.

price in the Service Agreement, excluding customers whose Rate Adjustment provision was subject to a rate restriction during the class period.

**IT IS FURTHER ORDERED** that Plaintiff's counsel is appointed counsel for the class.

Dated this 26th day of September 2025.

_John A. Ross_

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE