**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| CIS COMMUNICATIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 4:21-cv-00359-JAR |
| vs. | ) | |
| | ) | |
| REPUBLIC SERVICES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiff's motion to amend the class definition after the Court granted class certification in this action for breach of contract and related claims. The motion is fully briefed and, for the reasons stated below, will be granted in part and denied in part.

**BACKGROUND**

The facts and procedural history are set forth at length in the Court's order granting class certification. (Doc. 147). To summarize as relevant to the instant motion, Plaintiff CIS Communications is a wireless telecommunications site development company headquartered in St. Louis County, Missouri. Defendants Republic Services (RSI) and its subsidiary Allied Services (Allied) provide waste removal services for commercial, industrial, and residential customers. In May 2005, Plaintiff signed a Customer Service Agreement (CSA) for waste removal services with Allied's predecessor in interest, Midwest Waste (collectively Allied). The agreement established a basic service rate of $44 per month, with a rate adjustment clause permitting Allied to increase the rate unilaterally for certain specific reasons or for any other

reason with Plaintiff's consent. (Doc. 95-7). Payments were due within ten days of the invoice, and late payments were subject to late fees.

According to the complaint, from 2005 to 2018, the basic service charge billed to Plaintiff increased incrementally from $44 per month to $328.19 per month for the same service. Allied never provided any explanation for these increases or indicated whether they corresponded to unilateral reasons or required consent; the invoice line item "Basic Service" simply escalated over time. (Doc. 95-18). In August 2018, Plaintiff complained, and Allied offered to reduce the monthly rate to $55. Suspecting that Allied had been raising rates without contractual justification or consent since the beginning, Plaintiff terminated the agreement and commenced this putative class action asserting claims of breach of contract, breach of the covenant of good faith and fair dealing, fraudulent inducement, and unjust enrichment.

The central issue in this case is whether Defendants' price increases complied with the terms of the operative CSA. In discovery, Defendants produced voluminous data files reflecting their pricing and invoicing practices. This evidence establishes that Defendants increase their prices every 10-12 months through a Yield Management Process (YMP). First, parent company RSI uses multiple internal data points to generate budget guidance for its subsidiaries by geographic area. Based on those recommendations, area-level directors then set targets for each area business unit. Business units built their budgets based on these targets. Each unit is expected to meet its overall price increase target, but they retained discretion to decide which customers receive price increases and at what amount. When a customer objects to an increase, account representatives are trained to provide an explanation to convince the customer to accept the new rate. If a customer continues to resist, then the rate can be renegotiated. If one customer's rate increase must be adjusted downward, the difference is applied to other customers to achieve the

target budget goal. Defendants do not and could not provide customers with an itemization of cost increases corresponding to the unilateral Rate Adjustment categories listed in the CSA, nor do Defendants' invoices indicate what portion of an increase is attributable to those categories versus any additional margin requiring consent. Plaintiff alleges deceptive billing practices in that payment of the entire invoice is mandatory and subject to late fees.

Plaintiff originally sought to certify a class consisting of all Missouri commercial and industrial customers who had a service agreement with any Defendant entity and paid more than the original rate during the class period. In response, Defendants argued that changes in the CSA template over time and rate restrictions negotiated by individual customers preclude class treatment because these variables would necessitate individual inquiry. To address this argument, Plaintiff revised the class definition to exclude customers who negotiated rate restrictions. Given this exclusion and left with a uniform class, the Court readily found that common issues of fact and law predominated. (Doc. 147). The Court therefore certified a class defined as follows:

> All Missouri commercial and industrial customers who had a Service Agreement with Defendants or their subsidiaries and affiliates at any time from January 1, 2014, to December 31, 2016, and who paid any amounts in excess of the original price in the Service Agreement, **excluding customers whose Rate Adjustment provision was subject to a rate restriction during the class period**.

After Defendants' petition for interlocutory appeal of the Court's certification order was denied (Doc. 148, 149), discovery resumed pursuant to an amended case management order. (Doc. 157). In March 2026, the parties submitted a joint proposed notice plan to provide notice of this lawsuit to class members. (Doc. 158). Before the Court approved it, however, the parties encountered a disagreement about which customers should be included in the class notice mailing list.

**The Issues**

Defendants construe the class definition to exclude entirely all customers whose rates were restricted for any time during the class period. So, for instance, if Customer X paid YMP price increases for two years of the class period but negotiated a reprieve for one year, that customer would be excluded from the class entirely. Conversely, in Plaintiff's view, Customer X is still a member of the class because it paid YMP increases for two years, but the calculation of damages would exclude the period of reprieve.

At the joint request of counsel, the Court scheduled a status conference and directed each party to submit a short position statement. In these filings, Plaintiff reported that Defendants' interpretation of the class definition would eliminate 5,834 out of 13,062 class members, i.e., 45% of the plaintiff class. (Doc. 163, 170-1). While this is significant, the Court nonetheless determined that Plaintiff's interpretation would require an amendment to the class definition and reconsideration of Rule 23 factors. Plaintiff then filed the instant motion to amend the class definition as follows:

> All Missouri commercial and industrial customers who had a Service Agreement with Defendants or their subsidiaries and affiliates at any time from January 1, 2014, to December 31, 2016, and who paid any amounts in excess of the original price in the Service Agreement, **if any such amounts were unrestricted price increases.**

Plaintiff asserts that it never intended to completely exclude these disputed class members when it revised its original class definition. Rather, it only meant to exclude their negotiated rate restriction periods from the calculation of damages. Plaintiff's damages expert, Patrick Kilbourne, confirms that Defendants' database is organized and coded such that he can identify when a customer paid a restricted rate and he can subtract corresponding amounts from

his calculations. (Doc. 170-1). Plaintiff insists that including these customers in the class doesn't affect the Court's previous analysis of Rule 23 factors.

In response, Defendants argue that (1) Plaintiff should be judicially estopped from taking a position so plainly inconsistent with its representations at the time of class certification and (2) the inclusion of customers with rate restrictions would require individual inquiry and thus dismantle commonality and predominance under Rule 23.[1] Additionally, for the first time here, Defendants argue that Plaintiff is an inadequate representative for class members who signed a later version of the CSA containing an arbitration clause, implemented as the new standard form starting in April 2021.

The Court held oral arguments on September 23, 2026. Upon review, the Court concludes that customers who paid restricted rates for part of the class period can be included in the class. However, customers who signed the April 2021 CSA must be excluded from the class because Plaintiff is not a typical or adequate representative for customers subject to arbitration and class waiver provisions and, moreover, those provisions preclude the claims asserted here.

**JUDICIAL ESTOPPEL**

As a threshold matter, Defendants argue that Plaintiff should be estopped from changing its position after the Court relied on the exclusion of customers with rate restrictions to certify the class.

---

[1] Defendants also assert that putative class members who contracted with unnamed RSI subsidiaries lack standing to sue. But Plaintiff asserts its claims against RSI as the alter ego of its subsidiaries. As the Court stated in its certification order (Doc. 147 at 8), Plaintiff's alter ego theory is not before the Court at this stage. The Court will not revisit the class definition as it relates to customers of Defendants' subsidiaries and affiliates – an issue far afield from the instant motion.

When a party takes one position and succeeds on it, judicial estoppel prevents that party from later assuming a contrary position. *Gustafson v. Bi-State Dev. Agency of Missouri-Illinois Metro. Dist.*, 29 F.4th 406, 410 (8th Cir. 2022). The court considers three non-exhaustive factors in the exercise of its discretion to apply judicial estoppel: "(1) whether a party's later position is clearly inconsistent with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that the court was misled; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the party if not estopped." *Id.* Judicial estoppel does not apply when the prior position arose out of "a good-faith mistake rather than as part of a scheme to mislead the court." *Id*. at 410-411.

Though Plaintiff denies that it ever intended to exclude these disputed customers entirely, it repeatedly asserted in its certification reply brief that "restricted *customers* would fall outside the proposed class definition." (Doc. 124 at 21-22). The Court thus understood that it needn't consider these customers when analyzing Rule 23 factors, and a plain reading of the class definition excludes these *customers*, not merely their damages. On this record, the first two factors for judicial estoppel are present. However, the Court sees no unfair advantage to Plaintiff or material prejudice to Defendants in considering whether a class including these customers meets Rule 23 criteria. A class has already been certified, and the proposed amendment would merely enlarge it. Notice has not yet been sent to class members. Denial of Plaintiff's motion on this basis, without reaching the merits, could leave thousands of proper class members' claims unbound by any judgment here. Accordingly, the Court exercises its discretion to entertain the instant motion and thus proceeds to the merits.

## LEGAL STANDARDS

Rule 23(a) allows individuals to sue on behalf of a class if: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law and fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy). Fed. R. Civ. P. 23(a).

If the foregoing criteria are satisfied, Rule 23(b)(3) permits a class action when the court finds that (1) questions of law or fact common to class members predominate over any questions affecting individual members (predominance) and (2) a class action is superior to other methods for fairly and efficiently adjudicating the controversy (superiority). Fed. R. Civ. P. 23(b)(3). Relevant considerations include (A) class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any related litigation already pending; (C) the desirability of concentrating claims in the forum; and (D) likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D). "An individual question is one on which evidence varies from member to member; a common question is one where the same evidence suffices for each member to make a *prima facie* showing." *Ford v. TD Ameritrade Holding Corp.*, 115 F.4th 854, 859 (8th Cir. 2024).

A district court has the power to amend a class definition at any time before final judgment. Fed. R. Civ. P. 23(c)(1)(C); *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 377 (8th Cir. 2018).

## ANALYSIS

The instant motion seeks to include in the class definition two distinct plaintiff subsets: (1) customers who negotiated restricted rates (i.e., departing from standard YMP increases) for

any time during the class period and (2) customers who signed a new CSA after April 3, 2021, when it materially changed to preclude the claims asserted in this lawsuit. The Court need not reprise the entire analysis of its previous order certifying the original class. (Doc. 147). The only new questions now are whether these subsets can be included in the class. The Court must apply Rule 23 factors to each group separately except for numerosity, which is undisputed and readily satisfied.[2]

**1. <u>Customers with rate restrictions during the class period</u>**

<u>Commonality</u>

Rule 23(a)(2) requires that the members of a class be united by a common question of law or fact. Fed. R. Civ. P. 23(a)(2). "Commonality requires a showing that class members have suffered the same injury." *Powers v. Credit Mgmt. Servs., Inc.*, 776 F.3d 567, 571 (8th Cir. 2015). What matters is the capacity of a class action to generate common answers to resolve the litigation. *Id.*

Defendants argue that customers who negotiated rate restrictions during the class period lack commonality because individual inquiry will be necessary to understand the nature of each restriction. The Court is not persuaded that an examination of each individual contract is necessary. Plaintiff centrally claims that Defendants imposed YMP rate increases in breach of any version of their contracts. To the extent this subset of customers paid those increases during any part of the class period, their claims and damages are the same as for other class members. To the extent this subset negotiated exceptions, the specifics are irrelevant because no claims

---

[2] Plaintiff's proposed class, including customers with rate restrictions and April 2021 contracts, comprises 13,062 members. (Doc. 163, 170). Of that number, 4,553 customers negotiated a restricted rate at some point during the class period, and 3,068 customers signed new contracts after April 3, 2021. (Doc. 170 at 6, 9). Accounting for overlap in these two subsets, together they comprise 5,834 customers. (Doc. 170 at 3). Defendants' interpretation excluding both yields a class of 7,228.

accrued in those periods, which can be identified in Defendants' database and extracted from any calculation of damages.[3] These customers' claims remain uniform with the existing class.

Moreover, these customers, who comprise nearly half the plaintiff class, [4] share additional commonality in their experience with Defendants' standard practice of adjusting rates to resolve complaints. *See In re Stericycle, Inc.*, 2017 WL 635142, at *6 (N.D. Ill. Feb. 16, 2017) ("Stericycle's uniform way of responding to and dealing with complaints also suggests that there was a common scheme …"). Eighth Circuit precedent and other caselaw support certification on these facts.

In *Custom Hair Designs by Sandy v. Cent. Payment Co., LLC*, 984 F.3d 595 (8th Cir. 2020), the Eighth Circuit upheld a class where customer contracts were subject to negotiation and contained some variation in terms and pricing, reasoning that questions of law and fact were predominant and slight variations only affected damages, which would be calculated using the defendant's own database. *Id*. at 601-602. In *Vogt v. State Farm Life Ins. Co.*, the Circuit upheld a class where some members received a credit during the period of overcharges. 963 F.3d 753, 766 (8th Cir. 2020). In *Stuart*, the Circuit upheld a class where some members recouped the subject payments. 910 F.3d at 376-77. In both *Vogt* and *Stuart*, the Circuit reasoned that whether

---

[3] At oral argument, counsel for Defendants explained that contract modifications are not always accurately reflected in Defendants' database. While this may complicate damage calculations, the Court does not accept the theory that lax administrative practices can prevent class treatment. "[N]o precedent suggests that poor bookkeeping should shield a company from potential liability … this Court rejects any argument that depends on Stericycle not adequately tracking its customer contracts.*" In re Stericycle, Inc.*, 2017 WL 635142, at *9 (N.D. Ill. Feb. 16, 2017). "[I]t would be more than troubling to deny class certification because of a lack of organization on Stericycle's end." *Id.*

Similarly, Defendants contend that some customer contracts cannot be located, thus precluding breach of contract claims. This ignores the possibility that customers retained their own copies. Even if not, Plaintiff asserts an alternative count for unjust enrichment that may apply in instances where no contract can be found. (Doc. 72 at 35).

[4] Excluding customers who signed the April 2021 contract as discussed below, the remaining class comprises 9,994 members, of which 4,553 (45%) had restricted rates during some part of the class period.

some plaintiffs would be able to prove damages was a merits question, and plaintiffs who didn't could be excluded before trial. *Vogt*, 963 F.3d at 767.

District courts, too, have found that shared facts relevant to affirmative defenses reinforce commonality. For instance, in *Boswell v. Panera Bread Co.*, the court found commonality where some class members' employment contracts were modified to contain a buyout cap that the defendant claimed they accepted by continuing their employment. 311 F.R.D. 515, 521 (E.D. Mo. 2015). The court noted, "Indeed, even Panera's modification and novation defenses appear to raise common questions." *Id*. at 528 n.8. In *Miller v. Optimum Choice, Inc.*, the court observed that common defenses such as voluntary payment – Defendants' theory here – provide "an additional link of commonality." 2006 WL 2130640, at *7 (D. Md. July 28, 2006) (citing *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003)).

In *Stericycle*, on facts virtually identical to this case, the court reasoned, "the exact series of events that led to different contracts and the amount at which each class member's [price increase] is capped does not play a role in the class injuries that plaintiffs allege, outside of an individualized calculation of damages. Legitimate affirmative defenses may be effective in striking class members or in lowering damages for individual class members, but they cannot be the sole grounds for defeating class certification." *Stericycle*, 2017 WL 635142, at *6 (finding typicality despite differences in how class members negotiated contracts and price caps).

Commonality is demonstrated when class members suffered the same injury and a class action can generate common answers to resolve the litigation. *Powers*, 776 F.3d at 571. Here, this subset of customers was subject to the same YMP price increases and invoicing for at least part of the class period. The exceptions they obtained reflect a uniform practice whereby Defendants addressed customers' objections by reducing their rates and redistributing the

difference to other customers to meet budget goals. (*e.g.*, Doc. 226-12 at 11-12; Doc. 226-13; Doc. 246 at 48; Doc. 246-11, 12). The fact question whether Defendants' YMP increases breached the Rate Adjustment clause, or whether payment constitutes consent, will still be common to all class members. "[T]he fact that a defense … may affect different class members differently does not compel a finding that individual issues predominate over common ones." *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 45 (E.D.N.Y. 2008) (citing *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000)).

The Court finds that, even including customers who negotiated rate restrictions during part of the class period, the questions of fact and law relevant to Plaintiff's claims will be common to all class members and resolved from common evidence.

Typicality and Adequacy

Rule 23(a)(3) requires that the named plaintiff's claims are typical of the class. Fed. R. Civ. P. 23(a)(3). "Typicality is fairly easily met so long as other class members have claims similar to the named plaintiff." *Postawko v. Missouri Dep't of Corr.*, 910 F.3d 1030, 1039 (8th Cir. 2018). Rule 23(a)(4) requires that the named plaintiffs adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). The adequacy factor serves "to ensure due process for absent class members, who generally are bound by a judgment rendered in a class action." *Rattray v. Woodbury Cty., Iowa*, 614 F.3d 831, 835 (8th Cir. 2010).

At the time of class certification, Defendants argued that Plaintiff isn't typical of the class or adequate to represent its interests because customer contracts and experiences vary, and Plaintiff allowed its own contract to renew 11 times before complaining. (Doc. 104-1 at 42-43). The Court disagreed, finding that, based on the global evidence, Plaintiff's experience was quite common of the class. (Doc. 147 at 17).

"Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims and gives rise to the same legal or remedial theory." *Postawko*, 910 F.3d at 1039. Here, all class members, including this subgroup, were subject to the same YMP increases and invoicing as Plaintiff. If a jury finds Defendants liable for breach of contract or any other theory asserted in the complaint, it would be so for all, and individual differences would affect only the amount of damages. *See Custom Hair Designs*, 984 F.3d at 604 (reasoning that differences in billing rates don't defeat typicality).

The Court continues to believe that Plaintiff's experience and resulting claims are typical of the class, and that Plaintiff will adequately represent the interests of the class.

<u>Predominance</u>

"Predominance gauges the relationship between common and individual questions in a case." *Custom Hair Designs*, 984 F.3d at 601. "The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Stuart*, 910 F.3d at 374-75. "Certification is appropriate if the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues. *Id*. at 375.

Again, the latest figures provided to the Court reflect that nearly half of all customers with actionable claims obtained a rate restriction at some point during the class period. Defendants argue that these customers should remain excluded from the class because it would be necessary to examine each of their contracts to understand the nature and breadth of each restriction. The Court remains unpersuaded by this theory for the same reasons discussed above with respect to commonality. The particulars of a given rate cap are irrelevant because no claims

or damages accrued during its effect, and Defendants' own database identifies restricted and unrestricted invoicing. Predominance can be satisfied even where a uniform practice is not applied identically to each class member. *Stericycle* is squarely on point:

> Here common issues predominate in both the breach of contract claims and the Illinois Consumer Fraud Act claims, each of which stems from Stericycle's common practice of regularly increasing customers' prices in violation of their contracts through the use of software programming. If Stericycle is found to have violated the law when it comes to one Subparagraph 2(b) provision, it will have violated the law to varying degrees in relation to all of the provisions. Individual proof will be necessary only if Stericycle's liability is first established as to contract violations. As for their fraud claim, plaintiffs have shown a standardized pattern of misrepresentations (over and above the verifiable contract breaches), listing several legal questions that will apply to the whole class. They have also demonstrated that based on Kilbourne's testimony class members' damages can be calculated using a common, reliable formula after resolving the liability questions. Those factors provide ample evidence of a common factual link and a uniform Stericycle policy (even if that policy may not be carried out identically when it comes to each class member), so that the predominance requirement has been satisfied. Even if Kilbourne's formula were to turn out to need fine tuning or if his data were to need updating by looking at contracts manually, his research provides satisfactory evidence that damages can be calculated with a common formula applied to the entire class.

2017 WL 635142, at *8. The same is true here.

Predominance "requires an analysis of whether a prima facie showing of liability can be proved by common evidence or whether this showing varies from member to member." *Boswell*, 311 F.R.D. at 529. As in *Stericycle*, Defendants' YMP price increases and invoicing practices applied to all customers in the class, including these 4,553 customers for at least part of the period. The question of whether those practices breach the Rate Adjustment clause, or whether payment constitutes consent, will continue to predominate. *See Boswell*, 311 F.R.D. at 530 (reasoning that defendant's theory of defense would succeed or fail for the whole class). Likewise, Plaintiff's claims based on uniform representations in form contracts and invoices can

be proved through common evidence and reasonable inferences therefrom. *Id*. at 531 (collecting cases); *Stericycle*, 2017 WL 635142, at *8.

Thus, even including in the class this subset of customers who obtained a restricted rate for some part of the class period, the Court finds that common questions continue to predominate and can be answered by common evidence.

<u>Superiority</u>

The second inquiry under Rule 23(b)(3) requires courts to determine whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The only sub-factor relevant to the instant motion is manageability. Fed. R. Civ. P. 23(b)(3)(D). Again, despite Defendants' theory that individual issues would render class litigation unmanageable, the Court continues to believe that the case can be presented to a jury with common evidence and that damages can be ascertained from Defendants' own pricing and invoicing data. *Stericycle*, 2017 WL 635142, at *9 (rejecting the argument that defendant's database was too inaccurate to calculate damages). The inclusion of customers with rate restrictions during some part of the class period does not alter the Court's analysis, particularly insofar as Defendants' standard practice affected nearly half the resulting class.

For the foregoing reasons, the Court finds that a plaintiff class containing customers who paid restricted rates for part of the class period will continue to satisfy Rule 23 criteria. Therefore, to the extent Plaintiff seeks to amend the class definition to include these customers, the motion will be granted.

**2. Customers who signed new contracts after April 3, 2021**

This issue was not before the Court at the time of original briefing on class certification, but both parties raise it here now. On April 4, 2021, Defendants began implementing a new CSA containing materially different terms. This new version entitled them to increase rates for any reason, subject only to a customer's objection within 30 days, absent which continued service and payment constituted consent. Additionally, it contained a dispute resolution clause stating in pertinent part:

> Customer and Company agree that any and all existing or future controversy or claim between them arising out of or related to this Agreement, whether based in contract, law or equity or alleging any other legal theory, or arising prior to, in connection with, or after the termination of this Agreement, shall be settled by arbitration … . Customer and Company agree that under no circumstances, whether in arbitration or otherwise, may Customer bring any claim against Company, or allow any claim that Customer may have against Company to be asserted, as part of a class action, on a consolidated or representative basis or otherwise aggregated with claims brought by, or on behalf of, any other entity or person, including other customers of Company or its parent or corporate affiliates.

The parties did not previously anticipate that this 2021 CSA would impact the plaintiff class given that the class period reaches back to January 1, 2014, through December 31, 2016. However, preparation of the notice list revealed that 3,068 potential members are affected. Plaintiff now seeks to include these customers in the class, asserting that their claims accruing under earlier versions of the CSA remain viable. In response, Defendants contend that Plaintiff is an inadequate representative for this group because the 2021 CSA contains a retroactive arbitration clause and class action waiver that Plaintiff has no standing to challenge.

While the Court questions whether this is properly framed as a standing issue here,[5] voluminous caselaw supports Defendants' position that a named plaintiff who is not bound by arbitration or class waiver provisions is not a typical or adequate representative for members who are subject to such terms. *See e.g., Lawson v. Grubhub, Inc.*, 13 F.4th 908, 913 (9th Cir. 2021); *Avilez v. Pinkerton Gov't Servs., Inc.*, 596 F. App'x 579 (9th Cir. 2015); *Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 125 (E.D.N.Y. 2019); *Malone v. ASAP Trans Corp.*, 2025 WL 2977781, at *3 (N.D. Ill. Oct. 22, 2025); *Eaton v. Ascent Res.-Utica, LLC*, 2024 WL 1458457, at *6 (S.D. Ohio Apr. 4, 2024); *Heredia v. Sunrise Senior Living LLC*, 2021 WL 811856, at *4 (C.D. Cal. Feb. 9, 2021); *Johnson v. BLC Lexington, SNF, LLC*, 2020 WL 3578342, at *7 (E.D. Ky. July 1, 2020); *Spotswood v. Hertz Corp.*, 2019 WL 498822, at *11 (D. Md. Feb. 7, 2019).

Plaintiff wholly fails to address this body of caselaw, instead arguing that the arbitration/waiver provision isn't clearly retroactive by its terms and, even construed that way, Defendants agreed not to enforce it retroactively in a different case and should be bound by that concession here. *See Buffalo Seafood House LLC v. Republic Servs., Inc.*, 2023 WL 8850821 (D.S.C. Dec. 21, 2023).[6] But these are precisely the sort of merits arguments that Plaintiff isn't situated to advocate. The foregoing case law consistently counsels that Plaintiff is neither a typical nor adequate representative for customers who would have to overcome the 2021 arbitration and class waiver provisions. Moreover, even to the extent these defenses should be

[5] Defendants cite *Conners v. Gusano's Chicago Style Pizzeria*, 779 F.3d 835 (8th Cir. 2015), where the Eighth Circuit held that the named plaintiff, a former employee in a putative collective action under the Fair Labor Standards Act, lacked standing to enjoin an arbitration agreement applicable to current employees. But that case arose in an emergency procedural posture requiring the named plaintiff to demonstrate her own imminent injury traceable to the arbitration clause. *Id*. at 840-41. On the present facts, this Court finds superior guidance in cases applying Rule 23 criteria.

[6] In *Buffalo Seafood*, after the district court found that RSI and certain subsidiaries had engaged in improper communications with potential class members by pressing customers to sign the 2021 CSA, the parties stipulated that the arbitration/waiver provisions would not apply retroactively in that case.

resolved at the certification stage,[7] the Court does not share Plaintiff's interpretation of the subject contract language or stipulation. In the Court's view, the 2021 CSA clearly refers preexisting claims to arbitration and precludes participation in any class action. Likewise, Defendants' stipulation in *Buffalo Seafood* was plainly limited to that case and does not apply here.

Finally, Plaintiff notes that Defendants didn't raise this issue in their original opposition to class certification and argue it now for the first time. While this may be true, Plaintiff supplies no authority for the notion that Defendants may waive any Rule 23 requirement. "A district court may not certify a class until ***it*** is satisfied, after a rigorous analysis, that Rule 23(a)'s certification prerequisites are met." *In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608, 612 (8th Cir. 2017) (emphasis added). The court's duty does not end after initial certification, and close scrutiny is even more important when adequacy of representation is at issue. *Id*.

The Court finds that Plaintiff is not a typical or adequate class representative for customers who signed the 2021 CSA. The Court further finds that any motion seeking to name an alternate representative for these customers would be not only untimely, at this stage of the case, but also futile insofar as the arbitration and class action waiver provisions preclude the litigation of any preexisting claims in this forum. Given that these determinations are dispositive and fatal to Plaintiff's motion with respect to these customers, the Court need not consider other Rule 23 criteria.

To the extent Plaintiff seeks to include customers who signed new contracts containing arbitration and class waiver provisions after April 3, 2021, the motion will be denied and the

---

[7] *See In re Marriott Int'l, Inc.*, 78 F.4th 677, 687 (4th Cir. 2023) (prescribing resolution of class waivers at the certification stage).

class definition will be amended to specify their exclusion.

## CONCLUSION

Even with the inclusion of customers who paid restricted rates for some part of the class period, the Court remains convinced that common questions of law and fact predominate over individual matters, that Plaintiff's claims are typical of Defendants' customers such that it can adequately represent them, and that a class action is the superior method to resolve their common claims. Plaintiff's motion will be granted in part to include in the class customers who paid a restricted rate during some part of the class period.

However, the Court finds that Plaintiff is not a typical or adequate representative for customers who signed the 2021 CSA containing arbitration and class action waiver provisions. Moreover, those provisions preclude the claims asserted in this case. Consequently, these customers must be excluded from the class definition.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's motion to amend the class definition is **GRANTED in part and DENIED in part**. (Doc. 169). The class shall consist of:

> All Missouri commercial and industrial customers who had a Service Agreement with Defendants or their subsidiaries and affiliates at any time from January 1, 2014, to December 31, 2016, and who paid any amounts in excess of the original price in the Service Agreement, excluding customers who executed new contracts with arbitration and class waiver provisions after April 3, 2021.

**IT IS FURTHER ORDERED** that the parties are directed to confer and file a proposed schedule for further proceedings by **November 13, 2026**.

Dated this 27th day of October 2026.

John A. Ross

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE